743 S.E.2d 109

Ajoy CHAKRABARTI and Sukla Chakrabarti, Respondents,

v.

CITY OF ORANGEBURG, Appellant.

Appellate Case No.2012–207348.

No. 5126.

Court of Appeals of South Carolina.

Heard March 12, 2013.

Decided May 1, 2013.

Rehearing Denied June 20, 2013.

---

Pete Kulmala, of Harvey & Kulmala, of Barnwell, for Appellant.

C. Bradley Hutto, of Williams & Williams, of Orangeburg, for Respondents.

SHORT, J.

In this negligence and inverse condemnation case, the City of Orangeburg (Orangeburg) appeals, arguing the trial court erred in: (1) concluding its demolition of Ajoy and Sukla Chakrabartis' house amounted to inverse condemnation requiring payment of just compensation; (2) denying its motions for a directed verdict and judgment notwithstanding the verdict (JNOV) on the causes of action for gross negligence and sovereign immunity; and (3) awarding two distinct damage amounts on the two causes of action. We affirm in part and reverse in part.

## FACTS

In 2003, the Chakrabartis purchased a fire-damaged house located in Orangeburg, South Carolina. Ultimately, Orangeburg determined the house to be a nuisance and condemned it under the International Property Maintenance Code (IPMC), which Orangeburg adopted as its building maintenance code. Orangeburg demolished the house in August 2005. On July 26, 2007, the Chakrabartis filed a complaint against Orangeburg, alleging negligence in condemning the house as a nuisance and demolishing it and seeking actual damages. In its answer, Orangeburg asserted fourteen defenses including: (1) collateral *estoppel/res judicata;* (2) waiver; (3) sole and comparative negligence of the Chakrabartis; and (4) immunity under the South Carolina Tort Claims Act (the Act). The Chakrabartis filed an amended complaint, adding additional causes of action for wrongful condemnation, inverse condemnation, and trespass.[1]

A trial was held October 5–7, 2011, with the issue of inverse condemnation being tried by the bench and all other causes of action, including the amount of damages, being decided by the jury. At the close of the Chakrabartis' case, Orangeburg

---

1. The Chakrabartis withdrew their cause of action for trespass during the trial.

made motions for a directed verdict as to the negligence and inverse condemnation causes of action, and as to its immunity under the Act. The court denied the motions, finding there was sufficient evidence in the record to create a factual question for the jury to determine if Orangeburg was grossly negligent. At the close of all evidence, the Chakrabartis moved to amend their pleadings to conform to the gross negligence standard and withdraw their cause of action for negligence with no objection from Orangeburg. The court determined there was a compensable taking, and the jury returned a verdict of gross negligence and awarded damages of $165,000 for negligence and $85,000 for just compensation. The Chakrabartis moved post-trial to elect the negligence verdict of $165,000 and preserve their right under the inverse condemnation award in the event the negligence award was reduced or set aside. Orangeburg filed a motion for JNOV, and in the alternative, for a new trial or new trial *nisi remittitur*, and for an order requiring the Chakrabartis to elect a remedy. The court denied all of Orangeburg's motions. This appeal followed.

## STANDARD OF REVIEW

When reviewing the denial of a motion for a directed verdict, this court views the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Pond Place Partners, Inc. v. Poole,* 351 S.C. 1, 15, 567 S.E.2d 881, 888 (Ct.App.2002). A directed verdict motion is properly granted if the evidence as a whole is susceptible of only one reasonable inference. *Id.* In ruling on a directed verdict motion, the trial court is concerned only with the existence or non-existence of evidence. *Id.* This court will only reverse the trial court when there is no evidence to support the ruling below. *Id.*

When considering a motion for JNOV, the trial court is concerned with the existence of evidence, not its weight. *Curcio v. Caterpillar, Inc.,* 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003). When reviewing the denial of a motion for JNOV, this court does not have the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence, and the jury's verdict must be upheld unless no evidence reasonably supports the jury's findings. *Id.*

## LAW/ANALYSIS

### I. Gross Negligence

Orangeburg argues the trial court erred in denying its motions for a directed verdict and JNOV on the Chakrabartis' cause of action for gross negligence. We disagree.

Orangeburg argues the Chakrabartis were not entitled to recovery on their gross negligence cause of action because they presented no evidence of a breach by Orangeburg of any duty owed to the Chakrabartis in connection with Orangeburg's decision to condemn and demolish their house. Orangeburg also argues the Chakrabartis did not show its decision to demolish their house was inconsistent with or violated its internal property maintenance code; thus, there was no evidence of gross negligence.

A plaintiff must prove three elements to recover on a claim for negligence: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach. *Carolina Chloride, Inc. v. Richland Cnty.*, 394 S.C. 154, 163, 714 S.E.2d 869, 873 (2011). "If any of these elements is absent a negligence claim is not stated." *Summers v. Harrison Constr.*, 298 S.C. 451, 455, 381 S.E.2d 493, 495 (Ct.App.1989). "The court must determine, as a matter of law, whether the law recognizes a particular duty[, and] [i]f there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999).

"Ordinarily, under South Carolina's public duty doctrine, public officials are 'not liable to individuals for their negligence in discharging public duties as the duty is owed to the public at large rather than [to] anyone individually.'" *Tanner v. Florence Cnty. Treasurer*, 336 S.C. 552, 561, 521 S.E.2d 153, 158 (1999) (quoting *Jensen v. Anderson Cnty. Dep't of Soc. Servs.*, 304 S.C. 195, 199, 403 S.E.2d 615, 617 (1991)). "Generally, there is no common law duty to act. An affirmative legal duty, however, may be created by statute, contract relationship, status, property interest, or some other

special circumstance." *Jensen*, 304 S.C. at 199, 403 S.E.2d at 617.

▇▇▇ The Act is the "exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C.Code Ann. § 15–78–200 (2005). The Act provides that "[t]he State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein." S.C.Code Ann. § 15–78–40 (2005). "The burden of establishing a limitation upon liability or an exception to the waiver of immunity under the Tort Claims Act is upon the governmental entity asserting it as an affirmative defense." *Steinke*, 336 S.C. at 393, 520 S.E.2d at 152. "Provisions establishing limitations upon and exemptions from liability of a governmental entity must be liberally construed in favor of limiting liability." *Id.*

▇▇▇ Under the Act, a governmental entity is not liable for a loss resulting from certain enumerated events including "licensing powers or functions including, but not limited to, the issuance, denial, suspension, renewal, or revocation of or failure or refusal to issue, deny, suspend, renew, or revoke any permit, license, certificate, approval, registration, order, or similar authority except when the power or function is exercised in a grossly negligent manner." S.C.Code Ann. § 15–78–60(12) (2005). A potential licensee, licensee, or an injured third party may seek relief under this exception. *Steinke*, 336 S.C. at 393, 520 S.E.2d at 152. "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Etheredge v. Richland Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275, 277 (2000). "Gross negligence has also been defined as a relative term, and means the absence of care that is necessary under the circumstances." *Id.*

On March 6, 2003, Orangeburg Building Official Alan Ott sent the Chakrabartis a letter notifying them Orangeburg declared the house was unsafe, unfit for use, and a public

nuisance, and advised them of alternatives for future responsive action. On April 7, 2003, the Chakrabartis applied for a building permit and identified the owner was acting as the contractor, which required they not rent or sell the house for a period of two years. The same date, a handwritten permit application was filed identifying Thomas Darby as the contractor and reflecting a scheduled completion date of June 2, 2003, for the exterior and August 1, 2003, for the interior. However, the restoration work was not completed by those dates, and on May 19, 2004, Ott again wrote to the Chakrabartis advising them of the deadlines and giving them a deadline of sixty days for the completion of the exterior repairs.

On August 5, 2004, Orangeburg Building Inspector David Epting wrote to the Chakrabartis advising them they had thirty days from August 4, 2004, to complete the exterior work and one-hundred-and-twenty days from August 4, 2004, to complete the interior work. On September 9, 2004, Orangeburg Building Inspector Gene Nelson wrote the Chakrabartis, summarizing a meeting between the parties to address Orangeburg's concerns that the Chakrabartis did not intend to occupy the house upon completion, and the initial building permit was based upon the assumption they would live in the house for at least two years. The letter advised the Chakrabartis that Orangeburg had voided the April 7, 2003 building permit; the Chakrabartis were to hire a licensed architect to evaluate the condition of the house and submit a plan for safety and code compliance; and Orangeburg would issue a new building permit to the Chakrabartis.

Orangeburg issued the Chakrabartis a new building permit on December 7, 2004, identifying Michael Stroman as the contractor and specifying a June 10, 2005 completion date. On June 13, 2005, Nelson wrote to the Chakrabartis advising them that after an inspection of the house, he found it to be unsafe, unfit for human habitation, and a public nuisance. The letter stated the Chakrabartis were in violation of code section 110.1, and the residence must be demolished before July 13, 2005. If the Chakrabartis did not demolish the house by July 13, 2005, the letter stated Orangeburg would demolish the house and bill the Chakrabartis for the cost of the work. The letter also provided "any person affected by this decision shall have the right to appeal to the Construction Board of Appeals

within [twenty] days of service of the notice." The Chakra-bartis did not appeal. On June 15, 2005, Orangeburg person-ally served the Chakrabartis with the notice of condemnation. Thereafter, Orangeburg demolished the house in August 2005, which cost $12,025.

Section 110 of the IPMC addresses demolition. IPMC Section 110.1 provides a city may demolish an unsafe house as a nuisance if one of three requirements are met: (1) the city deems it impossible to save (unreasonable to repair) and ordered its demolition; (2) the owner and the city both agree to demolish it; or (3) in cases where repairs have been undertaken, any substantial construction had ceased for two years.[2] Orangeburg asserts the evidence provides compelling proof that there was "cessation of normal construction" of more than two years on the Chakrabartis' property. Orange-burg maintains there is little doubt the requirement was met, considering the history of the project from March 2003 to June 2005. It also asserts that because the Chakrabartis' work on the house was so sporadic, especially between the summer 2004 inspection and the June 2005 decision to demol-ish the house, it is questionable whether they ever began "normal construction."

Orangeburg asserts the testimony of Gene Nelson, Code Enforcement Officer for Orangeburg, and Jim Meggs, former attorney for the City of Columbia, supports its assertion that Orangeburg followed procedure in demolishing the Chakra-bartis' house. Nelson testified he did not have to ask permis-sion from the Chakrabartis before demolishing their house. He stated that when he finds a property in disarray or in a condition that is a danger to the city, he has the right to condemn it by notifying the homeowners. He further testified the Chakrabartis had not done any work on the house from the time he issued the second permit until he did the final condemnation, and it was still in the same condition as when he first inspected it in 2004. Meggs testified the June 13, 2005 demolition letter complied with section 110 of the IPMC, contained all of the required elements, and was a good and effective notice under the code. He further stated that based

---

2. On appeal, Orangeburg only argues subsection (3) of IPMC Section 110.1. It does not argue subsections (1) or (2).

on his review of all of the documents in this case, Orangeburg complied in all respects with the requirements of the IPMC in reaching the ultimate removal of the property. He testified that based on the history in this case it did not seem there was ever normal construction as contemplated by the IPMC.

The Chakrabartis' second contractor, Johnnie Coulter, was hired in December 2004. He testified he did work on the roof and ceilings; studded walls; put insulation in the walls; performed some electrical work; and installed some sheetrock. He further testified he was working on the house until Orangeburg bulldozed it. The Chakrabartis presented into evidence a check made out to Coulter for $5,000, dated August 19, 2005, that notes it was for the "last payment of Middleton St. House." Nelson, Orangeburg's former code enforcement officer, testified that when he inspected the house in August 2004, some sheetrock had been installed, which had not been approved by the city. He also testified that some electrical work had been done between the time Orangeburg issued the second permit in December 2004 and the demolition in August 2005.

The Chakrabartis argued Orangeburg was grossly negligent in demolishing their house without waiting the requisite time, the cessation of normal construction for a period of more than two years after work began, as required by section 110.1 of the IPMC. In its order denying Orangeburg's post-trial motions, the trial court found Orangeburg issued a second building permit to the Chakrabartis six months prior to demolishing their house, and Orangeburg produced no evidence of a date when substantial construction on the property had ceased for any significant period, much less the required two years. Therefore, the trial court determined Orangeburg did not follow the proper procedure in demolishing the Chakrabartis' house.

Under any of the gross negligence definitions, we find the trial court properly denied Orangeburg's motion for a directed verdict because, when the facts are viewed in the light most favorable to the Chakrabartis, the record shows Orangeburg issued a second building permit to the Chakrabartis six months before demolishing their house, and Orangeburg produced no evidence of a date when substantial construction on

the property had ceased for any significant period, much less the required two years. Further, evidence was presented that the Chakrabartis' contractor was doing work on the house until Orangeburg demolished it. Therefore, evidence was presented that Orangeburg did not follow the proper procedure in demolishing the Chakrabartis' house.

We also find the trial court properly denied Orangeburg's motion for JNOV because we find the evidence reasonably supports the jury's findings. *See Curcio,* 355 S.C. at 320, 585 S.E.2d at 274 (providing that when reviewing the denial of a motion for JNOV, this court does not have authority to decide credibility issues or to resolve conflicts in the testimony and evidence, and the court must uphold the jury's verdict unless no evidence reasonably supports the jury's findings).

## II. Sovereign Immunity

Orangeburg argues the trial court erred in denying its motions for a directed verdict and JNOV based on sovereign immunity. We disagree.

Orangeburg asserts it is immune to liability pursuant to the following three subsections of section 15–78–60 of the Act: (1) section 15–78–60(2) (governmental entity is not liable for a loss resulting from administrative action or inaction of a legislative, judicial, or quasi-judicial nature); (2) section 15–78–60(4) (governmental entity is not liable for a loss resulting from adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies); and (3) section 15–78–60(23) (governmental entity is not liable for a loss resulting from institution or prosecution of any judicial or administrative proceeding). S.C.Code Ann. §§ 15–78–60(2), (4), (23) (2005).

None of these three exceptions contain a gross negligence standard. When an exception that contains the gross negligence standard applies to a case, the gross negligence standard is read into any of the other applicable exceptions. *See Steinke,* 336 S.C. at 398, 520 S.E.2d at 155 ("[T]he trial court often faces Tort Claims Act cases in which at least one of the asserted exceptions contains the gross negligence stan-

dard while other asserted exceptions do not. We hold that when an exception containing the gross negligence standard applies, that same standard will be read into any other applicable exception. Otherwise, portions of the Act would be a nullity, which the Legislature could not have intended."). It would make no sense to conclude Orangeburg may be found grossly negligent in a licensing decision, yet allow it to escape liability under one of these other exceptions. Because we find Orangeburg may be liable if it was grossly negligent in its licensing per section 15–78–60(12), and the trial court properly denied Orangeburg's motion for a directed verdict for gross negligence, we also find the court properly denied Orangeburg's motions for directed verdict based on sections 15–78–60(2), (4), and (23).

Further, we find the trial court properly denied Orangeburg's motion for JNOV based on these sections because we find the evidence reasonably supports the jury's findings. *See Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 (providing that when reviewing the denial of a motion for JNOV, this court does not have authority to decide credibility issues or to resolve conflicts in the testimony and evidence, and the court must uphold the jury's verdict unless no evidence reasonably supports the jury's findings).

### III. Waiver and Estoppel

Orangeburg argues the Chakrabartis are barred from recovery in negligence by the defenses of waiver and estoppel because they did not appeal from the June 13, 2005 letter informing them they had twenty days from the date of the letter to appeal the decision to the Construction Board of Appeals.

Orangeburg first raised the defenses of waiver and estoppel in its answer to the Chakrabartis' amended complaint. During trial, Ajoy Chakrabarti conceded he did not file an appeal. At the close of the Chakrabartis' case, Orangeburg made two motions for directed verdict, at which time it did not argue waiver and estoppel. The court did not rule on waiver and estoppel. Thereafter, the court charged the jury with waiver and estoppel. Orangeburg did not take exception to the jury instructions.

Orangeburg then raised waiver and estoppel in its motion for JNOV, new trial, new trial *nisi remittitur*, and for election of remedies, asserting the court erred in denying its motion for directed verdict because of the Chakrabartis' noncompliance with the appeal provision. In its order denying Orangeburg's post-trial motions, the court did not rule on waiver and estoppel. Orangeburg did not file a Rule 59(e), SCRCP motion. Therefore, because Orangeburg did not raise the issue of waiver and estoppel to the trial court in its directed verdict motion, we find the issue is not preserved for our review. *See Scoggins v. McClellion*, 321 S.C. 264, 267, 468 S.E.2d 12, 14 (Ct.App.1996) (holding an issue not raised in a directed verdict motion will not be considered on appeal concerning the denial of the directed verdict); *In re McCracken*, 346 S.C. 87, 92–93, 551 S.E.2d 235, 238 (2001) (stating only issues raised in a directed verdict motion can properly be raised in a JNOV motion); *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review.").

## IV. Inverse Condemnation

Orangeburg argues the trial court erred in concluding its demolition of the Chakrabartis' house amounted to inverse condemnation requiring payment of just compensation. The Chakrabartis concede this issue in their brief. Accordingly, we reverse the $85,000 judgment on the inverse condemnation cause of action.

## V. Damages

Orangeburg argues the trial court erred in awarding two distinct damage amounts on the two causes of action. The Chakrabartis concede the court erred in finding Orangeburg's demolition of their house amounted to inverse condemnation and abandon the $85,000 judgment on that cause of action. Therefore, we only address the arguments relating to the $165,000 award for gross negligence.

The Chakrabartis assert the jury appropriately found they were entitled to $165,000 in damages for their gross negli-

gence cause of action. They argue they notified Orangeburg of their intended charge as to actual damages, and Orangeburg took no exception to the charge. The court instructed the jury on actual damages, and the Chakrabartis assert the jury's award properly included all expenses associated with putting them as near as possible in the same position they were in before the incident occurred. *See Austin v. Specialty Transp. Servs., Inc.*, 358 S.C. 298, 312, 594 S.E.2d 867, 874 (Ct.App.2004) ("The basic measure of actual damages is the amount needed to compensate the plaintiff for the losses proximately caused by the defendant's wrong so that the plaintiff will be in the same position he would have been in if there had been no wrongful injury.").

The Chakrabartis presented evidence in support of their damages. Sukla Chakrabarti testified they purchased the house for $35,000; paid their contractor, Darby, $40,000; and paid another contractor, Johnnie Coulter, more than $100,000. She testified that in her opinion, the fair market value of the house was between $160,000 and $170,000. *See Bowers v. Bowers*, 349 S.C. 85, 92, 561 S.E.2d 610, 614 (Ct.App.2002) ("As a general principle, a landowner, who is familiar with her property and its value, is allowed to give her estimate as to the value of the land and damages thereto, even though she is not an expert."). The Chakrabartis presented into evidence without objection checks written to Coulter totaling $106,476.55, and Coulter testified his contract with the Chakrabartis was for $150,000 and there was about $30,000 worth of work left. They presented a check written to Darby for $5,000. Darby testified the Chakrabartis paid him between $35,000 and $40,000. Ajoy Chakrabarti also testified they paid Darby $40,000. The deed for the house shows a $35,000 purchase price. Therefore, we find the jury's award of $165,000 was within reason and not disproportionate based on the evidence presented to them. *See Austin*, 358 S.C. at 311, 594 S.E.2d at 873 (providing this court's task in reviewing a damages award is not to weigh the evidence, but to determine if there is any evidence to support the damages award); *Hutson v. Cummins Carolinas, Inc.*, 280 S.C. 552, 557, 314 S.E.2d 19, 23 (Ct.App.1984) ("In determining whether there was sufficient evidence on which the jury could base its verdict, we are mindful that the fact that damages occurred in

one of several ways does not defeat a claim if the evidence tends to support the reasonable probability of the theory relied on. In a civil action, proof to a certainty is not required.").

## CONCLUSION

Accordingly, we affirm the trial court's denial of Orangeburg's motions for directed verdict and JNOV and the jury's award of $165,000 in damages for the Chakrabartis' gross negligence cause of action. We reverse the trial court's finding of inverse condemnation and award of damages for inverse condemnation.

**AFFIRMED IN PART AND REVERSED IN PART.**

THOMAS and PIEPER, JJ., concur.